IMPORTANT NOTICE: Courtesy copies of documents you file should NOT be provided to any judge. All communications with the court SHALL ONLY be by document filed with the Clerk of Court.

RECEIVED
IN ALEXANDRIA, LA

DEC 2 9 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

CLARENCE SCHREANE,
    Plaintiff

VERSUS

JOE KEFFER, et al.,
    Defendants

CIVIL ACTION
SECTION "P"
NO. 1:09-cv-01252

JUDGE JAMES T. TRIMBLE
MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a motion for summary judgment filed by defendant Beemon. The other two defendants in this case, Keffer and Townsend, filed a separate motion.

Procedural History

Before this court is a complaint filed pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999 (1971), on July 24, 2009 and amended on September 1, 2009 (Doc. 3) and January 19, 2010 (Doc. 10), by pro se plaintiff Clarence Schreane ("Schreane").[1] The named defendants are Joe Keffer, (former) warden of the United States Penitentiary in Pollock, Louisiana ("USP-Pollock"), and Unit Manager Townsend

---

[1] The original complaint was used for purposes of this Report and Recommendation because the first amended complaint is missing a page (due to a scanner error) and the second amended complaint deals with exhaustion issues rather than Schreane's allegations.

and (former) Correctional Officer Tamechia Beemon,[2] both employed by the Bureau of Prisons ("BOP") at USP-Pollock.

Schreane alleges in his complaint that, while he was incarcerated in the A-2 Unit of USP-Pollock on May 1, 2008, Unit Officer Beemon was entertaining an inmate from the C-2 unit when a fight broke out in A-2. Schreane contends the warden had posted a January 2008 memorandum for inmates and staff to allow no inmates from other housing units into a unit to which they were not assigned. Schreane contends he had previously informed both Warden Keffer and Officer Townsend that Beaumont was allowing inmates from C-2 into the A-2 unit, thereby risking the lives of the inmates in A-2. Schreane further contends Beemon labeled him a snitch by telling the C-2 inmates that Schreane complained to the warden about them visiting A-2; Schreane was assaulted by inmates later that day. Thus, Schreane has alleged failure to protect claims. For relief, Schreane asks for both general and punitive damages (Doc. 3). Schreane is presently confined in USP-Canaan in Waymart, Pennsylvania.

Defendants Keffer and Townsend filed a motion to dismiss for lack of jurisdiction or, alternatively, for summary judgment (Docs. 19, 23) which was granted (Doc. 38).

Next, Schreane and Beemon filed cross-motions for summary judgment (Docs. 42, 50), which are now before the court for disposition.

---

[2] Schreane misspelled Officer Beemon's name as "Officer Beaumont."

2

It is noted that defendants did not file an answer in this case. Therefore, Beemon's motion serves as her pleading responsive to the complaint. To the extent that any of the allegations in the complaint are not specifically denied by Beemon in her motion, they will be deemed admitted in accordance with Fed.R.Civ.P. rule 8(b)(6).

## Law and Analysis

### Motion for Summary Judgment

Beemon contends she is entitled to a motion for summary judgment because Schreane failed to state an Eighth Amendment claim for failure to protect, and she is entitled to qualified immunity.

#### 1. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts

submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

In this regard, the substantive law determines what facts are "material". A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82(1992).

2.

Beemon contends she is entitled to a summary judgment because Schreane has not demonstrated that she failed to protect him in violation of the Eight Amendment. Beemon further contends that, in any event, she is entitled to qualified immunity.

2. Qualified Immunity

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996). Qualified immunity cloaks a law enforcement officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights (or Bivens) lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> "The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this

5

>  defense by establishing that the official's allegedly wrongful conduct violated clearly established law."

Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001), citing Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional rights; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. Hare, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent. Officials must observe general, well-developed legal principles. Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).

In the case at bar, the alleged Eighth Amendment failure to protect violations took place on May 1, 2008. Schreane alleges Beemon admitted inmates from the C-2 housing unit into Schreane's housing unit (A-2) in violation of clearly posted prison policy. Schreane further alleges that, although he told Warden Keffer and Townsend about Beemon's policy violations, they did not take action to stop it. Schreane also alleges that Townsend told the C-2 inmates that Schreane had complained about them, resulting in them

attacking Schreane later that day, May 1, 2008.

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Being violently assaulted in prison is simply not a part of the penalty that criminal offenders pay for their offenses against society. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1976-1977 (1994). Labeling an inmate a snitch also violates a guard's duty to protect the inmate. Irving v. Dormire, 519 F.3d 441, 451 (8th Cir. 2008); Benefield v. McDowall, 241 F.3d 1267, 1271-1272 (10th Cir. 2001); Valandingham v. Bojorquez, 866 F.2d 1135, 1138-1139 (9th Cir. 1989); Harmon v. Berry, 728 F.2d 1407, 1409 (11th Cir. 1984). Also, Smith v. Rabalais, 659 F.2d 539 n.19 (5th Cir. 1981), cert. den., 455 U.S. 992, 102 S.Ct. 1619 (1982)(recognizing the danger involved when a prison informer's identity is revealed). Therefore, Schreane has alleged the violation of a constitutional right that was clearly established in 2008.

Under the second prong of the qualified immunity test, the court must determine whether the defendant's conduct was objectively unreasonable in the light of that then clearly established law. Hare, 135 F.3d at 325-36. Objective reasonableness is a question of law for the court. The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum

7

standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable. <u>Hare</u>, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct. <u>Douthit v. Jones</u>, 619 F.2d 527, 533 (5th Cir. 1980). A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. <u>Douthit</u>, 619 F.2d at 533.

### 3. The Eighth Amendment Right to Safety

The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates. <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994). In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Being violently assaulted in prison is simply not a part of the penalty that criminal offenders pay for their offenses against society. <u>Farmer</u>, 114 S.Ct. at 1976-77.

For an inmate to succeed on a claim based on a failure to prevent harm, he must show that (1) he was incarcerated under

8

conditions posing a substantial risk of serious harm, and (2) the prison official was "deliberately indifferent" to his health or safety. Failing to act with deliberate indifference to a substantial risk of harm is the equivalent of recklessly disregarding that risk. Farmer, 114 S.Ct. at 1978. Deliberate indifference is a subjective test and it must be shown that the official actually knew of the risk of harm to the inmate. It is insufficient to show solely that the official should have known of the risk. The official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference. Farmer, 114 S.Ct. at 1979.

Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. It remains open to an official to prove that he was unaware of even an obvious risk to inmate health and safety. Farmer, 114 S.Ct. at 1981-82. Also, Hinojosa v. Johnson, 277 Fed.Appx. 370, 374 (5th Cir. 2008). However, a prison official who actually knew of a substantial risk to inmate health and safety may be found free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted. Farmer, 114 S.Ct. at 1982-83.

The failure of a prisoner to give any advance notice to prison officials of potential danger to the prisoner's safety is not

9

dispositive of the issue of the official's awareness, nor is advance notice of a substantial risk of assault posed by a particular fellow prisoner a prerequisite. <u>Farmer</u>, 114 S.Ct. at 1984-1985.

Therefore, the law as to inmate failure to protect claims was clearly established in 2008.

### 4. Schreane's Failure to Protect Claim

In the case at bar, Schreane alleged in his verified complaint and in his affidavit that Beemon was assigned to supervise the A-2 Unit on April 22, 2008 (Docs. 1, 18). Schreane also alleged that Beemon allowed inmates from the unit she previously worked in, C-2, to visit the A-2 unit, in violation of a posted policy prohibiting any inmate from entering a housing unit to which he was not assigned (Docs. 1, 18). Schreane further alleged in his complaint and affidavit that he told Unit Manager Townsend about Beemon's violations on April 27, 2008, and he told Warden Keffer on about April 29, 2008 (Docs. 1, 18). Schreane alleged that, on May 1, 2008, he told Beemon that her allowing C-2 inmates into the A-2 unit was causing A-2 inmates to become irritated with her (Docs. 1, 18). However, at 6:30 p.m. on May 1, 2008, Beemon still allowed C-2 inmates into the A-2 housing unit and a fight broke out in the Sally port outside of A-2 (Docs. 1, 18). Schreane alleged that Beemon did not respond to the fight when other officers did because she was not paying attention, but was instead entertaining an inmate from C-2 (Docs. 1, 18). Schreane alleged in his complaint that, when Unit Manager Townsend locked down the A-2 unit, Schreane

"discretely" advised him again that Beemon had been entertaining inmates from C-2 and identified one of the C-2 inmates present in A-2 at that time; three inmates from C-2 were then found in A-2 (Docs. 1).  Schreane also alleged in his complaint that, at about 8:30 p.m. on May 1, 2008, a friend of one of the C-2 inmates who had been caught in A-2 approached Schreane in the activity room and confronted him about having reported the C-2 inmates to the officers (Docs. 1, 18).  Schreane alleged that he was then assaulted and injured by two inmates while another held the door (Doc. 1).

Schreane submitted a copy of the rules posted by Warden Keffer which prohibits inmates from visiting housing units other than their own (Doc. 1); as stated below, that policy memo was directed to *both the inmates and BOP staff*.  That policy memo states in pertinent part:

> January 8, 2008
> **MEMORANDUM FOR ALL STAFF AND INMATES**
> FROM:    Joe Keffer, Warden
> SUBJECT: Inmate Expectations; Rules
>
> The purpose of this memorandum is to serve as a reminder to all inmates of some basic rules and regulations which must be followed.  I believe most inmates want to live in an institution where they can work and program without having to worry about being victimized or having their daily activities disrupted.  Unfortunately, there are some inmates who continue to engage in behavior which negatively impacts everyone.  These behaviors include assaults with weapons as well as destroying equipment and appliances meant for use by everyone.  Consequently, these types of behaviors cannot be tolerated.
>
> In order to ensure everyone clearly understands my expectations, the following is a list of rules which, beginning immediately, will be enforced without question.  These rules are not new, however, they have not been followed to my standards and greater restrictions appear

11

to be necessary. Please read and familiarize yourself with these regulations. Your compliance with each of them is mandatory and there will be zero tolerance for anything less.

### INMATE EXPECTATIONS/RULES
**********

-   Inmates are not allowed in any housing unit other than the one to which they are assigned."

The purpose behind the policy, of reducing inmate assaults and other misconduct, is stated and apparent. See <u>Rose v. Carey</u>, 2008 wl 4443229, *5 (S.D.Ind. 2008)("Prisons are dangerous places, and require rigorous security measures to insure inmate and staff safety. Restricting inmate movement, and knowing where inmates are at any point in time, are integral components of providing for inmate and staff security."). According to the Bureau of Prisons' website,[3] USP-Pollock is a high security institution.

Schreane contends in his allegations under penalty of perjury that Beemon allowed inmates from the C-2 housing unit into the A-2 housing unit (Doc. 1). In her statement of undisputed facts (Doc. 50), Beemon states that she never knowingly allowed an inmate not assigned to A-2 to enter or remain, that she expelled any inmates not from A-2 that she found there, and that she does not recall Schreane complaining to her about the presence of inmates not assigned to A-2. Beemon further states in her statement of undisputed facts (Doc. 50) that there were approximately 120 inmates assigned to the A-2 unit, she did not always recognize all inmates, and she had many other duties than simply guarding the

---

[3] See http://www.bop.gov/locations/institutions/pol/index.jsp.

12

unit entrance.

Schreane alleges that Unit Officer Beemon violated USP-policy by allowing C-2 inmates to visit the A-2 housing unit and thereby created an obvious risk, of which she was aware, to Schreane's safety. Beemon denies that allegation and argues that Schreane was assaulted due to his own indiscreet complaints in front of other inmates. Officer Townsend, the A-2 Unit Manager, stated in his affidavit (Doc. 19) that Schreane complained to him very loudly about Beemon allowing the C-2 inmates into the A-2 unit, he told Schreane he needed to quiet down and discuss it with Townsend later in a different place because other inmates could hear him; thirty minutes later he was informed that Schreane had been assaulted by an A-2 inmate (Doc. 19).

It is established by Townsend's affidavit that C-2 inmates were found in the A-2 unit at the time of and after the altercation. According to Schreane, had they not been present, he would not have complained about them and would not have been assaulted. However, Beemon contends that she always immediately expelled any inmates she found in A-2 who did not belong there, claiming a reasonable response to a known safety issue. Beemon's denial that she was deliberately indifferent to the safety of Schreane and other inmates, by knowingly allowing the C-2 inmates to enter the A-2 unit or remain in the A-2 unit, creates a genuine issue of material fact.

Beemon also contends she was not aware of any risk of harm specifically to Schreane, but the risk of harm from inmates being

13

in a housing unit to which they are not assigned is self-evident as discussed above; it constitutes a security issue for both inmates and staff. Beemon further contends that Schreane was attacked by an A-2 inmate and, therefore, the presence of the C-2 inmates was not related to the attack. However, Schreane alleges the C-2 inmates were present in the A-2 unit because they had friends in A-2 who were involved in the attack on Schreane. Therefore, Schreane has alleged a causal connection between the presence of the C-2 inmates in the A-2 unit and the attack on him.

Thus, the primary issue appears to be whether Beemon knowingly allowed the C-2 inmates to enter and/or remain in the A-2 unit and was thereby deliberately indifferent to the risk they posed to Schreane's safety. Beemon's and Schreane's allegations are in direct opposition on this issue. Neither has adduced any other evidence to support their sworn statements.

Since there are genuine issues of material fact which preclude a summary judgment, both Beemon's and Schreane's motions for summary judgment should be denied as to Schreane's failure to protect claim.

### 5. Snitch Claim

Beemon also contends she is entitled to a summary judgment on Schreane's claim that he was assaulted because she labeled him a snitch. Defendants argue that Schreane was assaulted by an inmate from A-2. However, Schreane states in his affidavit (Doc. 1) that the C-2 inmates told his friends in the A-2 unit that Schreane had reported them to the officers. Also, the BOP's response to

14

Schreane's informal resolution complaint (Doc. 25) shows the investigation revealed that, shortly after the emergency (due to the inmate fight at A-2) was over but before the inmates had dispersed, Schreane complained loudly to the Unit Manager regarding "other inmates being out of bounds and in violation of policy." the BOP's response (Doc. 25) further shows that Schreane's loud comments were heard by many inmates in A-2, some whom were friends of the C-2 inmates Schreane had identified. Although this document tends to show some fault on the part of Schreane for his indiscretion, it also tends to show C-2 inmates were present in the A-2 unit and that the assault on Schreane by an A-2 inmate was a result of the unauthorized presence of the C-2 unit inmates.

Schreane states in his sworn complaint (Doc. 1) and in his affidavit (Doc. 18) that Unit Officer Beemon told the C-2 inmates he had been the one to report the unauthorized presence of the C-2 inmates in the A-2 unit, and that they told their friends in A-2, who assaulted Schreane. Labeling an inmate a snitch violates a guard's duty to protect the inmate. <u>Irving v. Dormire</u>, 519 F.3d 441, 451 (8th Cir. 2008); <u>Benefield v. McDowall</u>, 241 F.3d 1267, 1271-1272 (10th Cir. 1001); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1138-1139 (9th Cir. 1989); <u>Harmon v. Berry</u>, 728 F.2d 1407, 1409 (11th Cir. 1984). Also, <u>Smith v. Rabalais</u>, 659 F.2d 539 n.19 (5th Cir. 1981), cert. den., 455 U.S. 992, 102 S.Ct. 1619 (1982) (recognizing the danger involved when a prison informer's identity is revealed). When officials are aware of a danger to an inmate's health and safety, such as when an inmate becomes a snitch, it

violates the constitutional prohibition against cruel and unusual punishment to fail to afford that inmate reasonable protection. Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. 1981). The Eighth Circuit has held that a reasonable prison guard would have known that to label an inmate a snitch would violate his constitutional right to protection from harm. Irving, 519 F.2d at 452. Also, David v. Hill, 401 F.Supp.2d 749, 757 (S.D.Tex. 2005). A prison official acts with deliberate indifference if he helps create a risk to an inmate's health or safety, such as when a prison official disseminates information that an inmate is a snitch. Adames v. Perez, 331 F.3d 508, 514 (5th Cir. 2003). Therefore, the law as the safety issues involved in labeling an inmate a snitch was clearly established in 2008.

In this case, Schreane states in his affidavit that the C-2 inmate said Beemon told him that Schreane had spoken to her about her allowing the C-2 unit inmates into the A-2 unit (Doc. 18). Beemon states in her affidavit and statement of material facts that she did not tell any inmates that Schreane had complained about the C-2 inmates. In his affidavit, Townsend states the other inmates knew Schreane was the snitch because Schreane had complained loudly about the C-2 inmates to Townsend within earshot of many other inmates who were standing nearby (Doc. 18). Beemon argues that Schreane's own indiscretion advised the other inmates that Schreane had snitched and led to his assault. Schreane states in his sworn complaint (Doc. 1) that he "discreetly" advised Townsend of the presence of C-2 unit inmates in the A-2 unit, but also admits there

16

was a C-2 inmate was standing by the door who saw him speaking to Townsend (Docs. 1, 18).

Since Schreane admits he spoke to Townsend in the presence of at least one of the C-2 inmates, Beemon denies telling anyone Schreane was a snitch, and Townsend states that Schreane spoke of it loudly in front of several other inmates, it appears the other inmates found out from Schreane himself that he was the snitch.

Since there are no genuine issues of material fact which would preclude a summary judgment, Beemon is entitled to a summary judgment and qualified immunity as to Schreane's snitch claim.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that both Beemon's and Schreane's motion for summary judgment (Docs. 42 & 50) be DENIED on Schreane's failure to protect claim.

IT IS FURTHER RECOMMENDED that Beemon's motion for summary judgment (Doc. 50) be GRANTED and SChreane's motion for summary judgment (Doc. 42) be DENIED on Schreane's snitch claim, AND Schreane's complaint against Beemon on the snitch claim be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District

Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 29th day of December, 2010.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE